Case No. 2 for the morning, Constellation Brands v. NLRB. These are appeal numbers 19-1321 and 19-1549. We are going to begin, Ms. Walker, with you. Good morning, Your Honors. May it please the Court, my name is Carol Hogan-Walker. I'm a partner with Kauffman, Dulawich, and Bollock, and we represent Petitioner, Constellation Brands, doing business as Woodbridge Winery. Constellation respectfully requests that this Court reverse and set aside the Board's decision where it determined wrongly that Constellation violated Section 8A.1 when it demanded that an employee, Mr. Chavez, remove a safety vest that was given to him for his safety, on which he wrote a racially insensitive, inflammatory, and offensive phrase, namely, Seller Lives Matter. As an employer, Constellation has a right to ensure that its workplace does not have racially insensitive speech. The Board, in this case, ignored the substantial evidence here. The Board, in this case, failed to apply its own analysis with respect to special circumstances as set forth in the Kamatsu and the Noah's New York Bagels case. Firstly, with respect to substantial evidence, the Union, in this case, has one witness, Mr. Chavez. We're not saying that the numbers matter, but the substance of the testimony matters greatly. And in this case, the witnesses were sequestered. When you look at that transcript, the four witnesses for Constellation, Norma Linda Cantu, HR Manager, Angela Schultz, HR Manager, Jeff Moeckde, he was the General Manager, and Josh Schultz. Their testimony is consistent. Why? Because it was the truth. Notwithstanding that, the Board ignored it. When we talk about substantial evidence and the factors that Constellation satisfied with respect to the special circumstances, the Board itself said an employer does not have to meet all of those exceptions, only one. Here, the substantial evidence demonstrates that Constellation satisfied three of those factors. Firstly, Constellation had a right to and had to remove that racially insensitive best, with that phrase on it, from its workplace. Mr. Walker, let me ask you this question. I know that this is counterfactual. It's hypothetical. Suppose that Mr. Chavez, on his safety vest, wrote, Union Lives Matter. Would your position change? No, the position would not change for the simple fact that Black Lives Matter movement, Black Lives Matter name, is ubiquitous. It's everywhere. And when you see Blank Lives Matter, that is a ripoff of Black Lives Matter, whose history is steeped in racial injustice and sometimes state-sanctioned violence against Black America. Anyone who sees Blank Lives Matter definitely views it as a ripoff of Black Lives Matter. In this case, the Board and the ALJ said, oh, there's nothing to do with race when you see Blank Lives Matter. Here, Solid Lives Matter. It does. And its name, Black Lives Matter, it represents Black people. So when someone uses that, that is offensive in the workplace because Black Lives Matter has and continues to be a polarizing entity as far as its name. Some people vilify it. Some people celebrate it. It has the impact where people have a visceral reaction to it. And because of that, Constellation had to do something immediately once it learned that this inappropriate, insensitive, offensive speech existed in its workplace. So under the special circumstances, the first prong was met with respect to ensuring that you did not have any issue with respect to your employee safety. The other prong that the substantial evidence demonstrates that Constellation satisfied had to do with the exasperation of the employee dissension. Again, an employee could have reacted badly. Was Constellation supposed to wait until something horrific happened? No. As an employer, it had a right to, it had a duty to ensure that this type of language was not in its workplace, and that's what it did. Employers have to be able to do that without having recourse. There's another prong that Constellation also met. One of the prongs says that if the display of a slogan unreasonably interferes with the public interest that the employer established, they satisfied it. That happened here. Constellation Brands has over 100 brands of wine, spirits, and whiskey. It sells it throughout the United States and also internationally. Many of its consumers, that's the heart of this company, they are in the brown and black community. Anyone in that facility could have taken a picture of the back of that vest, uploaded it. This is the society in which we live right now. Somebody in one of those communities could have seen it, and that could have impacted the public image that Constellation Brands has established in those communities, and that's why Constellation had to have the ability to do what it did because that type of speech is not protected under the NLRA. Now, below, which the board agreed with, there was some sentiment to try to trivialize this. Oh, it's just innocuous. It's not. Black Lives Matter is not a slogan. It is something that is raw, so raw that complicates this case right now. We saw last week our Capitol under siege. Every news media, when they talked about that, what did you hear them say? Black Lives Matter movement, the protest that happened last year. They talked a little bit about the police enforcement, but what are you hearing? Black Lives Matter, ubiquitous throughout the entire United States. So for this board and the ALJ to try to trivialize it to say it's innocuous, it's a passing fancy, it's not. It's dealing with race, and it's a race situation where people react in a visceral way. And because of that, Constellation had to have it removed from its workplace, and it should not be penalized for that. And it would be special request that your honors reverse that decision and set aside that order. Now, some of the other facts that were talked about in the brief. The ALJ judge expressly stated on page nine of his decision that the board basically accepted. He said that the slogan did not disparage respondents' business or product, nor harmed respondents' reputation in any way. Not true. On page 27 of the board's brief, it says that Constellation brand did not raise this argument, so it shouldn't be before your honor with respect to its image. It wasn't a record for love, and that's why we're raising it now to make sure that your honors are not going to accept that argument. I have one minute and 13 seconds left. I'm reserving five minutes for the rebuttal, but I would like to just continue with a couple of points. Can I pause you on that point, though, Ms. Walker? When you say it's in the record, in other words, there's evidence in the record that responds to the ALJ's finding that the business and its products may have been harmed. What is that evidence? What specifically do you have in mind? Well, what I have in mind is that each of the witnesses testified that this language was—we'll strike that—was offensive and inflammatory. They talked about their employees, and also, because of the significance of the Black Lives Matter movement, Angela Schultz expressly stated, it's everywhere. Black people are being killed. Police are being killed. That in and of itself has an image that Constellation has to make sure does not reflect badly on it. Constellation respects the Black Lives Matter movement. It supports it. So that's the— So it's the testimony of Angela—is it Angela Schultz and Josh Schultz and this— Yes, Angela Schultz. Jeff McCleckie, people like that. Okay. Well, primarily Angela Schultz, yes, Your Honor. And with that, I'd like to reserve my remaining 440 seconds—well, actually, I want to do one more thing, just to also respectfully request that Your Honors revert with respect to the bonus program. And with that, I'd like to reserve my remaining 430 seconds—31 seconds for my rebuttal. Thank you, Your Honors. Very good. Thank you, Ms. Walker. We'll now move to Mr. Weitz. Good morning. May it please the Court, Eric Weitz on behalf of the National Labor Relations Board. The first unfair labor practice that the Board found in this case involved the straightforward application of the Board's well-established legal standard for Section 7 insignia in the workplace, which is in fact not contested on review. Under that standard, employees have a statutory right to wear Section 7-related insignia or apparel in the workplace, and any restriction of that right is presumptively unlawful. And the employer has the burden of showing special circumstances through the introduction of specific evidence and not just generalized speculation or testimony about presumed potential harms. In this particular case, the employee who wore the disputed vest, Mr. Chavez, was a well-known and active supporter of the union campaign that was going on at the employer's facility at the time. The employees in what's known as the seller department at this facility had already voted in a Board-supervised secret ballot election, and a majority of them had voted to be represented by the union. At the time of the events in question, the employer was engaged in litigating the validity of that election. In particular, the dispute was over the employer's argument that the seller department employees were not entitled to be represented by a union as a distinct unit. And Mr. Weitz, to accelerate to the end of that, that went to the Second Circuit. Was the ultimate conclusion then that the union was not certified? That's correct, Your Honor. The Second Circuit remanded to the Board for further analysis. Due to subsequent proceedings before the Board, it was remanded again. There was a change in Board law, and it went back to the Board's regional director. And ultimately, the union voluntarily withdrew its representation petition, so there was never actually a final determination. But I think the significance is that at the time of the events in question, when this vest was worn in the workplace, the context to that vest was that there was this ongoing dispute in the workplace over the union election and the union campaign among the seller department employees. And so as the Board found, Mr. Chavez, after consulting with his co-workers, decided to wear a pro-union slogan in the workplace with two aims. First, to highlight the importance of the work done by the seller department employees, which those workers thought was underappreciated by the employer. And secondly, to protest in the workplace the employer's ongoing refusal to recognize or bargain with the employee's chosen union. And so when Mr. Chavez chose the phrase, Seller Lives Matter, which was a reference to the Black Lives Matter movement that was in the news at the time, the context, as the Board found, indicates that no reasonable employee would understand that as having any kind of commentary on this outside social or political issue. Rather, it was intended to or would be understood as being intended to have a pro-union message in this particular workplace based on the fact-bound context of this case in particular. And so under the audit review, the employer does not contest that Mr. Chavez's decision to wear the vest was concerted activity for mutual aid and protection within the meaning of Section 7 of the Act. As a result, he had a statutory right to wear this vest, and the burden shifted to the employer to establish that its restriction of that vest, which was presumptively unlawful, was justified by special circumstances. Under the Board's well-established test, which again is not contested, the employer has to establish not just that a particular message was, in the employer's opinion, insensitive or in bad taste, but that it would actually disrupt or be likely to disrupt operations at the employer's facility. As the Board found, the employer's arguments in this case fail both factually and legally. First, as a factual matter, the Board found reasonably that, as I think I've been mentioning, the Cellular Lives Matter vest in context simply would not be interpreted as having any kind of offensive connotation. Secondly, even assuming that some individuals may find it insensitive, under the Board's legal standard, that is not enough. The employer has to come forward with evidence of likely disruption, which simply did not occur in this case. As we point out in our brief, the employer's opening brief is devoid of any references to the record. There's simply no evidence indicating a likely disruption based on any of the recognized categories of special circumstances under Board precedent, and that burden was not met in this case. Mr. Weitz, both parties cite Noah's Bagels and Komatsu. Is the record clear at all between this case and those two cases as to whether or not the slogans that were at issue were outward-facing to, say, consumers or purchasers versus inward-facing, where only other employees would see it? Yes. Well, starting with this case, Your Honor, as we point out in the brief, Mr. Chavez and his coworkers do not interact with customers at all as part of their normal work. They're at a large outdoor production area, and so they don't wear a uniform or interact with customers. In the Komatsu case, I believe that that was also a case where the message in question was internal to the facility, which is distinct from Noah's New York Bagels, where one of the key considerations of the Board was that the employee who wore the disputed T-shirt saying, if it's not union, it's not kosher, was actually a delivery driver who interacted with customers. And so part of the Board's finding in Noah's New York Bagels was that the message itself actually disparaged the employer's products in a way that was self-evidently likely to harm customer relationships, because particularly when you're an employer who focuses on kosher food products, as in that case, any suggestion that customers might view suggesting that the products were, quote, not kosher would be potentially harmful or likely harmful, and therefore the employer was entitled to prohibit it. In the Komatsu case, again, that was an internal message, but the key finding there was that based on the context in which the T-shirts in Komatsu were worn, the Board found that they were an unambiguous appeal to ethnic prejudices because they were an overt reference to the Japanese attack on Pearl Harbor during World War II, and the employer was not only a Japanese-owned company, but the T-shirts were worn to protest a recent managerial decision to outsource certain production facilities overseas to Japan. So the key finding of the Board in Komatsu was that wearing these T-shirts referencing the attack on Pearl Harbor was likely to disrupt relationships between employees and management in the workplace so as to disrupt the employer's operations. In contrast, nothing about the Cellular Lives Matter vest attacks the employer or has anything to do with internal relations or operations at the employer's facility. Rather, as noted, it was a pro-union message and would have been understood as such, and the only even arguable insensitivity involved a perceived relationship to outside political and social issues, which, again, simply had nothing to do with the internal labor dispute that the vest was worn. Mr. Weitz, let me ask you to respond to this line. So it's slightly different than the way Ms. Walker was articulating her position, but let me try to say it this way. What if Woodbridge simply said, there's no question, Mr. Chavez, that what you marked on your safety vest, in part or maybe even in the main, conveys a pro-union message? Okay, but it is a play on words that really connotes a lot of racial tension, racial pain, racial struggle that is front and center right now in America. And because of the kind of double-edged nature of it that way, you need to pick a different slogan, because we're worried about unrest in the workplace. Thankfully, nothing's happened yet, but that doesn't mean nothing will not happen. And furthermore, we're worried that it gets picked up in the various social media outlets and misconstrued. So our point is not to question your motive. In fact, you have a completely lawful right to promote the union. Our point is that you need to pick a different slogan. Can I get the benefit of your reaction to that, if they had handled it that way? Yes, Your Honor. Well, I would note that is, of course, very different than the initial reasons given by the managers. But taking the hypothetical, I don't think that that would alter the board's analysis, because under board precedent and Supreme Court precedent, employees have a right under Section 7 to choose messages of their choice, pro-union messages of their choice. Of course, as we emphasized in our brief, that is not an absolute right, which is why the board has this particular special circumstances framework, where an employer can come forward and say that this message in particular, that our interests in the workplace outweigh the employees' rights under Section 7. But in this particular case, the employer simply did not meet that burden. And so regardless of how it had been conveyed to Mr. Chavez at the time, I think the board's analysis would remain the same, that first of all, this particular message and context simply was not offensive. And secondly, that the employer had not met its burden before the board to establish special circumstances through the introduction of specific evidence of likely disruption at this facility in particular. And I note in general that this is ultimately a very fact-based determination by the board in weighing the evidence and coming to this conclusion and drawing the line of what is and what is not prohibitable. And that is a finding at the core of the board's expertise, which is entitled to deference from this court. And I'd also just like to reference… So in these – it sounds like what you're saying is in these kind of mixed messages that have more than one meaning, that the special – what is it called? The special circumstances test, that you actually require an affirmative presentation of some kind of evidence beyond the testimony of an HR director. So how would you handle a situation if Mr. Chavez had said, support the union, vote for Biden? Well, Your Honor, there is a certain point where a certain activity would not be found to be concerted activity for mutual aid protection within the meaning of the act. Because that has two messages to it, right? It's definitely pro-union, but it's also commenting on a major issue of national interest, the presidential election and the outcome of the election. Yes, Your Honor. Well, that might be – I'm not aware under board precedent if the board has ever split a message. Obviously, that's a situation where you could say part of the message is totally unrelated to the protected component. Isn't that Ms. Walker's point? Well, I don't think so, Your Honor, because this is a single phrase, cellular lives matter, that cannot really be split apart in the same way. This is, as the board found, a pro-union slogan. No, no, no. Her point is that anybody on the planet is going to connect that to the Black Lives Matter movement. You may be well right that in the Cellar Department that people will think of it as a pro-union message. But everyone on the planet is going to recognize it as connected to Black Lives Matter. Well, Your Honor, that actually raises an important point, which I wanted to get to, which is this question of public image or how people outside of this facility would construe this message. The employer did not raise that argument to the board at all in its acceptance to the board. And as a result, this court is actually jurisdictionally barred by Section 10E of the Act from reaching any of these arguments about public image or customer reaction to this particular vest. So as a jurisdictional matter, I don't think the court should reach that issue. But even assuming that it does, that argument fails for two additional reasons. First of all, there's no evidence that Mr. Chavez or his co-workers interact with customers or that customers would ever see this vest. And under board precedent, it's simply too speculative to say, to propose a hypothetical or a chain of events where an image of the vest could somehow wind up on social media. There's no reason to think that could ever occur. Even assuming on an additional chain of inferences that that happened under board precedent, negative reaction from the public is simply not a valid special circumstance. Because, for example, there are many customers of any employer who are vehemently opposed to the very act of unionization. That itself is, in essence, a political issue. And that's why under board and court precedent, the customers do not have a veto over the rights of employees to wear pro-union apparel in the workplace. Even assuming that employees or customers would ever see this image, and even assuming that customers would somehow construe a handwritten message on a vest and permanent marker, as somehow reflecting an endorsement by the employer or that there would be any negative reaction to the employer for something that one of its employees had done in this internal production facility. But again, that argument was never raised to the board, and it's in the employer's exceptions to the board. And as a result, it's not before the court. And I see that I'm almost out of time. If the court has any further questions about this violation or the second unfair labor practice, I'm happy to answer them. Otherwise, we would ask for enforcement in full. Thank you, Mr. Weitz. Ms. Walker, we'll go back to you for rebuttal. Thank you, Your Honor. Your Honor, Constellation acted properly in this case by requiring that the vest with the racially insensitive, offensive, inflammatory language be removed from its workplace. An employer has to have that right. We live in a society where Black Lives Matter is front and center. It has been front and center for a long time. In fact, Your Honor could probably take judicial notice of its existence in our country. It's ubiquitous. And the slogan here is synonymous with Black Lives Matter, and the history that it represents is absolutely everything to do about racial equality, race. And for the board to say it has nothing to do with ethnicity, nothing to do with race, it's not polarizing, it's not true. It's unrealistic. We all live in the same society. We all hear the same news media. Black Lives Matter has that effect on people in our community, a visceral reaction. It polarizes people. And Constellation could not risk having an employee, one employee, being injured because it reacted in one way and a fight broke out. Was it supposed to wait to have something like that happen? No. It showed leadership like an employer should show, and it made sure that that speech was taken out of its workplace. Now, another issue that was raised in the opposition's presentation had to do with the testimony here. Well, no outside person could see this. Not so. We live in a world where everything's online. Anyone in that facility who saw that vest on Mr. Chavez could have taken a picture of that, uploaded it, and it could have gotten into the communities where Constellation brand products are sold. Without the consumers, Constellation brand doesn't exist. As I previously stated, many of its products are utilized by consumers in the black and brown community. If they saw Cellulize Matter, they could have interpreted as, oh, my goodness, Constellation brand is allowing this to mock the Black Lives Movement. They're not receptive to it. They're not supportive of it. They don't respect it. That could have had a disastrous impact on Constellation brand, and they're supposed to wait until that happens? No. In the board's analysis, in the Komatsu case and the Knowers New York bagels case, you don't have to wait for actual harm, and what Constellation did in this case was the right thing. It had to do it to protect the employees and to protect what could have interfered with the public image it has established in the community. As a result, Constellation respectfully requests that the court reverse the wrong decision that the board made here by saying that it violated Section 8A1 when it directed an employee to remove the racially insensitive, offensive, inflammatory language that was contained on its safety vest and get it out of its workplace. In addition, Constellation brand requests that your honors reverse the decision with respect to the bonus plan that applies to any member of Constellation brand except union facilities, and out of the 40, there are two, and those two did not negotiate that in their CBA. And for those reasons, we respectfully request that you reverse the decision below. Thank you, your honors. Thank you, Ms. Walker. Thank you, Mr. Weitz. The case will be taken under advisory.